UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW YORK

_____
                                          )
In re:                                    )
                                          )
MARLENE CAMACHO AND DIEGO CAMACHO CH: 7   )    1-12-43472-cec
                                          )
[24] MOTION FOR BIFURCATION AND TO        )
     CONVERT CASE TO CHAPTER 13           )
                                          )
[25] MOTION TO EXTEND TIME TO OBJECT TO   )
     DISCHARGE                            )
_____)

                          U.S. Bankruptcy Court
                          271 Cadman Plaza Suite 1595
                          Brooklyn, NY 11201

                          March 14, 2013
                          1:03 p.m.

          BEFORE THE HONORABLE CARLA E. CRAIG, Judge

APPEARANCES:

For the Debtor:           Karamvir Dahiya
                          DAHIYA LAW OFFICES, LLC
                          75 Maiden Lane, Suite 506
                          New York, NY 10038


For the Trustee:          Jordan Pilevsky
                          LAMONICA HERBST & MANISCALCO
                          3305 Jerusalem Avenue
                          Wantagh, New York 11793


Proceedings recorded by electronic sound technician, Juliet
Lecky; transcript produced by AVTranz.

1          COURT DEPUTY:  Calling number 8, 9 and 23, Marlene

2     and Diego Camacho.

3          Counsel, appearances for the record.

4          MR. DAHIYA:  Good afternoon, Judge.  Karam Dahiya

5     appearing for the Debtor, Ms. Camacho.

6          MR. PILEVSKY:  Good morning, Your Honor.  Jordan

7     Pilevsky, LaMonica Herbst & Maniscalco on behalf of the

8     Trustee, and our position to the motion to convert.  Outside

9     the motion there are a couple other matters, but I don't know

10    in which order, Your Honor, would --

11         THE COURT:  Well, let's take the things to which

12    there's no objection.  There's no objection to the motion to

13    extend time to object to discharge, correct?

14         MR. DAHIYA:  Absolutely.  He didn't have to file a

15    motion.  There's no objection.  I've told him.

16         THE COURT:  Okay.  So without opposition the motion's

17    granted and you may submit an order.

18         MR. PILEVSKY:  Thank you, Your Honor.

19         THE COURT:  So -- and then the only other thing is --

20    well, there's the complaint -- the status conference on the

21    adversary proceeding.  And the motion for bifurcation and to

22    convert the case to chapter 13.

23         Now you don't -- it doesn't seem like you're opposing

24    bifurcation, correct?

25         MR. PILEVSKY:  That's correct, Your Honor.

1          THE COURT:  Okay.  So Mrs. Camacho has filed

2   schedules, correct?  Her own schedules?

3          MR. DAHIYA:  Yes, Your Honor.

4          THE COURT:  Okay.  So now I have to direct Mr.

5   Camacho to file his own schedules.

6          MR. DAHIYA:  I will request --

7          THE COURT:  Is he here?

8          MR. DAHIYA:  He's here, Your Honor.

9          THE COURT:  Okay.  Mister -- does he have his own

10  attorney?

11         MR. DAHIYA:  Ms. Joseph is representing him.

12         THE COURT:  Okay.  Then --

13         MR. DAHIYA:  I will tell her to --

14         THE COURT:  -- I wonder why Ms. Joseph isn't here.

15         MR. DAHIYA:  She's in depositions in Central Islip,

16  Your Honor.

17         THE COURT:  Okay.  I'm going to direct that Mr.

18  Camacho's schedules be filed.  I'm going to set a date for

19  that.

20         MR. DAHIYA:  That's fine, Your Honor.

21         THE COURT:  And then with respect to the motion to

22  convert the case, I think that that's going to need to be set

23  down for an evidentiary hearing.

24         MR. PILEVSKY:  Okay, Your Honor.

25         MR. DAHIYA:  I'm sorry, Your Honor.  If we could know

1   the reason please?

2           THE COURT:  I beg your pardon?

3           MR. DAHIYA:  And why evidentiary hearing's necessary

4   here?

5           THE COURT:  Because it's -- because matters --

6   questions of good faith are --

7           MR. DAHIYA:  Yes.

8           THE COURT:  -- inherently factual, are they not?

9           MR. DAHIYA:  Okay.  That's fine, Your Honor.

10          THE COURT:  It seems to me there are factual

11  questions involved here.  There may be some questions that are

12  clear on the papers.  If there were -- I guess you may have

13  questions about the Debtor's ability to confirm a plan.

14          MR. PILEVSKY:  I have various questions, which I

15  integrated in my papers, Your Honor.  I'd be happy to say them

16  on the record here today, unless Your Honor wants to save that

17  for an evidentiary hearing.

18          THE COURT:  Why don't you go ahead and do that?

19          MR. PILEVSKY:  The Debtor, Marlene Camacho, had filed

20  amended schedules as Your Honor just mentioned.  There's

21  several discrepancies.  One is that the nature of the adversary

22  proceeding, if you will, was to avoid and recover a prepetition

23  transfer of the Debtor's interest in real property to, I

24  believe, her ex-husband and to her daughter.

25          All the deeds that are of public record reflect that

1   Marlene had certainly a 25 percent interest before -- when the

2   property was first purchased.  However, she was transferred

3   from her mother, I believe it was her mother, Anna Sotto

4   (phonetic), in 2004 another 50 percent interest.

5          Two and a half years before the filing date she

6   transferred a portion of that interest, two thirds of it to the

7   daughter and to the son.

8          Now counsel has stated in its papers that her

9   interests on behalf of the children, the grandchildren of her

10  mother are being held in trust.  There are no trust documents.

11  The deeds themselves do not reflect that they're being held in

12  trust.  It doesn't refer to Ms. Camacho as a trustee on behalf

13  of anybody.

14         I know that this morning, at 6:30 this morning

15  counsel filed a will for -- of Ms. Sotto, the mother.  Now the

16  will I believe -- I don't have it because I just got it this

17  morning.  I got the email notification.  I believe that it says

18  that Anna Sotto would like her interest in the subject real

19  property to be transferred upon her death to her four

20  grandchildren.

21         However, seven months after that will was executed

22  Ms. Sotto, during her lifetime transferred the property

23  outright to the Debtor.  Thereafter, the Debtor mortgaged the

24  property and transferred it to her ex-husband, Jorge Casiado

25  (phonetic), who's a defendant in the adversary proceeding,

1  which was not in line with the will.

2        THE COURT: Well, and so -- but she -- and she was

3  alive at that point obviously?

4        MR. PILEVSKY: She was alive at the time, but upon

5  her death she didn't have any interest in property to transfer

6  to any grandkids. So that's number one.

7        Number two is with respect to the creditors. Now in

8  the original Schedule F, Marlene's creditors are listed as

9  undisputed in the amount of approximately $55,000.

10  (Indiscernible) passed, I believe, December 24th. Proofs of

11  claims were filed as against Marlene and her husband, the co-

12  debtor, but with respect to Marlene, the aggregate close to

13  $30,000.

14        Six weeks later, if we fast-forward six weeks later

15  the Debtor filed amended schedules in which she's now claiming

16  that she only has $8,000, having known that there are $30,000

17  of creditors who filed proofs of claim with this court. That's

18  number two.

19        Number three is with respect to the income and

20  expenses that were amended on schedules I and J. Debtor claims

21  that she has increased income of $1,000 in operation of a

22  business. I'm not aware of what business that is. I checked

23  the amended schedule D and the statement of financial affairs.

24  There's no mention of any business. In the Debtor's own

25  affidavit she has mentioned that she had a business in the past

1   which she lost to an ex-partner of hers, which she has

2   grievance against.

3        I don't know what business there is.  Plus on the

4   expense side, on the original schedules she had a second

5   mortgage in the amount of $497, which is curiously omitted from

6   the amended schedules.  If you calculate everything, there's a

7   negative income at the end of the day.  So I don't know how,

8   even if it was converted, that should be able to confirm a

9   plan.  She's minus $500 a month.

10       And now there's administrative fees.  And, Your

11  Honor, just for the record, when the trustee first got this

12  case and discovered the transfer, because it wasn't disclosed,

13  discovered the transfer we had reached out over six month

14  periods to try to consensually resolve this but no one got back

15  to us.

16       And then we commenced the adversary proceeding.  And

17  thereafter I was engaged in some type of settlement discussions

18  with Mr. Dahiya.  And at around 1:30 on a Thursday I got

19  another email from Mr. Dahiya saying -- asking me some other

20  aspect of the settlement.  And four hours later I'm hit with

21  amended schedules, and a motion to convert, which I cite in my

22  papers is not an absolute right of the Debtor, given the

23  factors here.  I don't think this is an atypical Debtor who,

24  based on the prepetition conduct and now the post-petition

25  conduct, I don't think can be a fiduciary to her own estate.

1              THE COURT:  Okay, all right.

2              MR. DAHIYA:  May I briefly state, Your Honor?

3              THE COURT:  Yes.

4              MR. DAHIYA:  I asked Mr. Jordan to tell me what his

5    administrative fees were.

6              THE COURT:  Do you mean Mr. Katz (sic)?

7              MR. DAHIYA:  Yeah.

8              MR. PILEVSKY:  Mr. Pilevsky.

9              MR. DAHIYA:  Pilevsky.

10             THE COURT:  Pilevsky, sorry.

11             MR. DAHIYA:  I spoke to him and I get along with him,

12   Your Honor.  I asked him as to what -- how much is the fees

13   because we plan to make payments to the unnamed claimants and

14   to the creditors to her estate, hundred percent of the dollar.

15   I never got that -- I asked him a few times, but he never

16   responded to my email.

17             And as far as the good faith is concerned, I spoke to

18   her.  Ms. Camacho is here.  She collected all paperwork, all

19   family history as to what really transpired.  Gave it to Ms.

20   Joseph.  And she said, I don't know what is happening.  I was

21   trying the best -- she wrote a letter to the trustee.  I don't

22   know if you got the letter or not.  She gave it to Ms. Joseph.

23   And she has been making good faith efforts.  And I realize

24   where this thing has gone wrong, because I think Ms. Joseph

25   kind of miscalculated.

1          I think if she's going by the value of the property

2     as 650,000, Your Honor, then there's nothing left if you look

3     into the interest, even if we go by the trustee's argument.

4     Nothing is left for the creditors.  I can show you the

5     calculations.

6          What has happened is, there's a misconception about

7     Jorge Casiado.  Jorge Casiado was one fourth owner of the

8     property.  His interest was never relinquished.  And so what

9     can happen is when you have property as tenants in common you

10    do not need the consent of the other partners.  You can sell

11    your shares, transfer share.  He never gave up his shares.  And

12    when he finds out Ms. Camacho had taken $200,000 for a

13    business.  He didn't know about it.  And he said, why did you

14    do this?  You should have asked me.  And then she goes, don't

15    worry, don't worry.  Your name is still there.  He said, no.

16    What have you done?  How can they finance the property without

17    my consent?

18         So what she does is in good faith -- she doesn't have

19    to do it.  She puts his name again.  And he says mother-in-law,

20    and that Sotto was supposed to give one fourth share to all the

21    grandchildren, the four grandchildren.  And that was the trust

22    -- that was the constructive trust here in this case.  So we

23    can explain --

24         THE COURT:  It's a constructive trust?

25         MR. DAHIYA:  It is.  New York State recognizes

1  constructive trust because they -- Ms. Marlene, one of the

2  owners, she's here.  She has not been -- and she's one of the

3  claimants, one fourth of the property.  She feels, oh my God,

4  we're going to lose our house.

5          THE COURT:  But the mother, you know, Ms. Sotto

6  transferred her interest to Ms. Camacho before she died.

7          MR. DAHIYA:  Yeah.  She transfer -- she told her,

8  please transfer these properties to my grandchildren.  She was

9  not an educated woman.  The children, the family -- other

10 members were impacted by this, the trustee's case.  They're

11 very upset about it.  They all were under the impression --

12 they will come here to testify.

13         THE COURT:  Well, but if you want to -- if you --

14 okay.  This -- now you're talking about a defense --

15         MR. DAHIYA:  No, no, no.

16         THE COURT:  -- to the trustee's action, which I'm

17 prepared to discuss and we can certainly hash that out on the

18 record.  Concept of constructive trusts, whether they --

19         MR. DAHIYA:  Yeah.  But --

20         THE COURT:  -- apply in this situation.

21         MR. DAHIYA:  No.  I'm just --

22         THE COURT:  That's one thing.  But now you want to

23 convert this to a 13 on behalf of the -- of Ms. Camacho.  And

24 that's -- and there's -- what we're talking about here today is

25 the motion to convert.

1          MR. DAHIYA:  Yes, Your Honor.

2          THE COURT:  And I have to determine whether

3   conversion is permissible here.

4          MR. DAHIYA:  Yes, Your Honor.

5          THE COURT:  And do you -- unless you're withdrawing

6   the motion to convert and you want to just talk about the

7   setting up a way of resolving the question of the --

8          MR. DAHIYA:  We --

9          THE COURT:  -- of the fraudulent conveyance on the

10  merits --

11         MR. DAHIYA:  No.  We don't need to go there because

12  that would be a waste of time and money.  When by virtue -- at

13  conversion of this case, Your Honor, when we can pay all the

14  claimants and the family can still be together and creditors

15  can still be paid.

16         THE COURT:  Well, but you can't pay -- you're going

17  to have to pay them as much as they would get in a chapter --

18         MR. DAHIYA:  Absolutely.

19         THE COURT:  -- 7 case.

20         MR. DAHIYA:  Yes, yes.

21         THE COURT:  So you --

22         MR. DAHIYA:  One of our claim, Your Honor, is she's

23  like 15 to 20,000.  We've noticed -- I've sent notice to the

24  creditors who filed proof of claim under 15 USC 1692(g) as a

25  validation of the debt.  I said, please produce evidence that

1   she owes you that money.

2            So what has happened is they have clumped his

3   interest and her interest together, so we have this proof of

4   claim.

5            So in one of this proof of claim the social security

6   that comes is not his, not hers.  So you know, the --

7            THE COURT:  I guess what that would be, it would be a

8   series of claims objections in the chapter 13.

9            MR. DAHIYA:  The other thing, Your Honor, is we will

10  -- if the case, Your Honor's kind enough to convert this case,

11  they will have a new -- the trustee -- the Court could issue a

12  notice and they will have 90 days' time to file fresh proof of

13  claim in this case under 3000(2)(c).  I think that's this

14  action.  So they will have a chance to --

15           THE COURT:  Having filed a claim in the 7 do they

16  have to file a claim in the 13?

17           MR. DAHIYA:  Yes.  They will have -- they'll get a

18  chance again, Your Honor --

19           THE COURT:  They may get another chance, but are

20  they --

21           MR. DAHIYA:  Yeah.

22           THE COURT:  -- required to?  Don't the -- do the

23  creditors who filed a claim in the 7, does that claim have to

24  be dealt with in the 13?

25           MR. DAHIYA:  Yes.  Why not, Your Honor?  That's a

1  claim against the estate.  So estate has to deal with that.

2         THE COURT:  Yeah

3         MR. DAHIYA:  So but what I'm saying is, if anybody's

4  missing, they get another bite at the apple now.  So I've

5  already issued letters to them under 1692(g) that you have to

6  give us evidence that you're the real person.  And under Fair

7  Debt Collection Act, Your Honor, under New York State laws,

8  under Truth in Lending laws, she's entitled.  And under section

9  501 valid proof of claims.  So I'm making it easy for them so

10 that I don't have to bring formal objections to proof of claim.

11        She can pay, Your Honor.

12        THE COURT:  I think you do have to bring formal

13 objections to proofs of claim.

14        MR. DAHIYA:  If they don't amend -- I'm writing

15 letters to them.  So I have the 7 letters, I've sent it out

16 yesterday.  So I'll take care of it, Your Honor.  We'll pay

17 them.  We'll take care of his fees.  And I spoke to the owner

18 whose credit history is good, Mr. Jorge Casiado.  I said you

19 might have to refinance the property.  So we're thinking from

20 that perspective too.

21        MR. PILEVSKY:  Your Honor, what I think is a little

22 unfortunate here is that we engage in these exact settlement

23 discussions.  We do -- the trustee does not need to liquidate

24 the -- all the equity in the property.  If counsel wants to

25 refinance why can't we do -- we can refinance right now and

1  these are the discussions that we've had before.  And the

2  trustee's more than amenable to give them time to do so.

3          Right now I believe the Debtor wants to put herself

4  into a chapter 13, although she can't confirm a chapter 13

5  plan.

6          MR. DAHIYA:  No.  There's a foreclosure proceeding.

7          MR. PILEVSKY:  And they've already, in essence, I

8  guess paved the way for claims objections.  And I told counsel,

9  he told me that there are claims I could be objecting to.  And

10 I emailed him.  I said, please, if there's any reason to object

11 to any of the claims on the file I welcome and invite any

12 reason to object.

13         MR. DAHIYA:  I still -- Your Honor --

14         MR. PILEVSKY:  But until I get that I have no reason

15 to object because they look valid.

16         Now in the schedules she's only disclosing $8300

17 worth of creditors.  He's already objecting to those claims.

18 And if the trustee needs to bring -- if it stays in a

19 chapter 7, if the trustee needs to bring claims objections

20 we'll do that.

21         MR. DAHIYA:  I -- Your Honor, I asked counsel, I said

22 how much do you want to settle.  He said 100,000.  I couldn't

23 believe this.  Then I said, how much again, 60,000.  And I

24 said, this is not reasonable.  She owes like no more than --

25 maximum, Your Honor, I don't think she's going to owe more than

1   25,000 out of estate.

2          It's kind of unfair for her to pay --

3          THE COURT:  Well, you know, as you may --

4   administrative expenses have to be paid as well.

5          MR. DAHIYA:  Yeah.  That's why I asked him.

6          THE COURT:  Even if you convert the case --

7          MR. DAHIYA:  Yes.  And --

8          THE COURT:  -- you're going to, as you may recall.

9          MR. DAHIYA:  -- this is like total repeat.  I stated

10  earlier, Your Honor, last hearing that this is like -- we will

11  have to take care of it.  I don't want him to spend too much

12  time and money in this case because we want to take care of

13  him.  I've told him, please tell us how much do you need.

14         THE COURT:  Okay.  Do you want to have an opportunity

15  to conference right now?

16         MR. DAHIYA:  No.

17         THE COURT:  Could that be helpful?

18         MR. PILEVSKY:  I -- if it would be productive I would

19  conference right now.  I mean, we've had these conversations in

20  the past.

21         MR. DAHIYA:  Why don't you fix a date, Your Honor,

22  and I'll ask him to send me his fees.  So based on this I'll

23  speak to him and I'll go and talk to Jorge Casiado, the entire

24  family.  They're fix -- six members together, Your Honor.  They

25  live together, the entire family.  So --

1          MR. PILEVSKY:  And clearly the administrative fees

2    have increased due to this --

3          MR. DAHIYA:  Because --

4          MR. PILEVSKY:  -- motion and the acquisition.

5          MR. DAHIYA:  Because --

6          MR. PILEVSKY:  Counsel's already told me when he

7    filed his motion that he's going to fight me on every fees from

8    that day forward.  Not to mention that the 10 percent that the

9    chapter 13 trustee's going to require.  It's just increasing

10   it, adding to --

11         MR. DAHIYA:  That's -- no, no, no.  Your Honor, I

12   sent him three, four emails.  I said, tell me your cost, he

13   never responded.  I have emails.  I said, please tell me how

14   much your fees so far.

15         MR. PILEVSKY:  I'll be happy to disclose all those

16   emails.

17         MR. DAHIYA:  Had he done it I would have taken care

18   of it.

19         THE COURT:  Sorry?

20         MR. PILEVSKY:  I said, I'd be happy to disclose all

21   those emails.

22         MR. DAHIYA:  Your Honor, I agree.  That's not a

23   problem.

24         THE COURT:  Okay.  So let me -- let's set this down

25   for a hearing.

1          (Counsel and Clerk confer)

2               THE COURT:  Okay.  So I'm going to give you May 1.

3    And I'm going to direct that a joint pretrial order be filed on

4    the 26th of April.  May 1 at -- what time?  At 1:00.  Is this

5    going to be an all-day hearing do you think, or do you think we

6    can do this in an afternoon?

7               MR. PILEVSKY:  I think it can be worked out in an

8    afternoon.

9               THE COURT:  Okay.  So I'm going to direct that a

10   joint pretrial order be filed on 4/26.  And I'm going to direct

11   that Mr. Camacho, Diego Camacho file schedules -- separate

12   schedules no later than March 29.

13              So this should give you enough time to see whether

14   you can settle this.  But I will also, I'm going to issue a

15   scheduling order.  And the scheduling order's going to provide

16   that the witnesses' testimony, and issues, and documents, and

17   exhibits not outlined in the joint pretrial order will not be

18   received at the trial.

19              So in other words -- and I'm talking to you, Mr.

20   Dahiya.

21              MR. DAHIYA:  I know, Your Honor.

22              THE COURT:  You have to file -- you have to

23   participate in the filing of the joint pretrial order.  And if

24   you don't, and if you don't file -- if you don't meet this

25   deadline, provide the exhibits and all the other relevant

1  materials and put -- have them on file on the 26th you will not

2  be able to present them at trial.  That's a firm deadline and I

3  will enforce that.

4          MR. DAHIYA:  I may have the exhibits also?  Did you

5  say that?

6          THE COURT:  I beg your pardon?

7          MR. DAHIYA:  Exhibits and --

8          THE COURT:  Well, the joint pretrial order requires

9  exhibits to be attached.  Is that what our form provides for,

10 or just described?  But you need to exchange exhibits.  You

11 need to exchange exhibits by the 26th.

12         MR. DAHIYA:  Okay.  That's fine, Your Honor.

13         THE COURT:  Okay.  And as I said, the issues are

14 going to be only those that are outlined, or described in the

15 joint pretrial order.  In other words, contentions, you're

16 bound by what you put in your joint pretrial order.

17         MR. DAHIYA:  Basically, you're focusing on the issue

18 vis-a-vis --

19         THE COURT:  Any --

20         MR. DAHIYA:  -- the capacity to propose the plan 13?

21         THE COURT:  Any issues relating to the ability to

22 confirm --

23         MR. DAHIYA:  Okay, that's fine.

24         THE COURT:  -- ability to convert the case.  So I

25 guess that would go to good faith.  And it would also go to

1   ability to confirm a chapter 13 plan.

2             MR. DAHIYA:  That's fine, Your Honor.

3             THE COURT:  Okay.

4             MR. DAHIYA:  Thank you, Your Honor.

5             MR. PILEVSKY:  Your Honor, I don't know if the -- I

6   mentioned in my papers, I don't know if Your Honor wants to

7   give some guidance on this.  I'm not quite sure who Mr. Dahiya

8   represents here.  He came in a couple months ago on behalf of

9   the defendants who were being sued to recover and avoid --

10            THE COURT:  Well, do you -- you represent the

11  defendants, correct?

12            MR. DAHIYA:  Yes, Your Honor.  I --

13            MR. PILEVSKY:  So he's representing now the Debtor

14  and the Defendants?

15            MR. DAHIYA:  Yes.  I represent the Debtors and the

16  Defendant.  And I did -- my associate, Your Honor, that counsel

17  has pointed out the issue of conflict.  There is no conflict.

18  He cited the case law with the -- that supports my position.

19  There has to be a conflict of interest adverse.  It is not a

20  party because the family is together.  They want to retain the

21  house.  There's a commonality of pursuit.

22            The trustee is -- I'm not represent -- if I'm

23  representing the trustee and the -- this party, then there's a

24  conflict.

25            THE COURT:  Okay, all right.

1          MR. DAHIYA:  It's --

2          THE COURT:  Are you making a motion to disqualify

3   counsel?

4          MR. PILEVSKY:  I don't have it on before the Court

5   today, but it's under consideration.

6          THE COURT:  Okay.  Well, I'm going to give you a date

7   by -- for that to be brought so that we don't have that.  If

8   you want to make a motion to disqualify I'm going to direct

9   that you do -- that you file it.

10          Can we give them a date in the week of -- the first

11  week of April for that?

12          MR. PILEVSKY:  Your Honor, I'm out for Passover in

13  the first couple days.  If could be the second week.

14          MR. DAHIYA:  I will not be here, Your Honor.  Out of

15  the country.

16      (Court and Clerk confer)

17          THE COURT:  How's April 4th.

18          MR. DAHIYA:  Fine.

19          MR. PILEVSKY:  Is that a Friday?  I don't have my

20  calendar.

21          THE COURT:  No, it's a Thursday.

22          MR. PILEVSKY:  That's for the return date?

23          THE COURT:  Yes.

24          MR. PILEVSKY:  Oh, okay.  That's fine.

25          MR. DAHIYA:  I'm -- Your Honor --

1          THE COURT:  So any motion to disqualify counsel --

2          MR. DAHIYA:  I'm supposed to leave on the 4th.  I was

3    thinking we're leaving on 4th.

4          THE COURT:  Well, how about --

5          MR. DAHIYA:  That's --

6          THE COURT:  -- can you leave the next day?

7          MR. DAHIYA:  I will have to -- yeah.  I'll have to

8    check that out.  I was --

9          MR. PILEVSKY:  If I can just understand when

10   counsel's going to be away because I don't want it to affect

11   the joint pretrial memorandum.  Just what are the dates

12   counsel's going to be away?

13         MR. DAHIYA:  No.  I'll be leaving on the 4th.  I'll

14   be out for 12 to 14 days, Your Honor.  I'll be back for the

15   26th of April; I'll be back.

16         MR. PILEVSKY:  My only question is until when?  I

17   mean, it takes a joint effort.

18         THE COURT:  Okay.  Maybe --

19         MR. PILEVSKY:  We'll work that out.

20         THE COURT:  Maybe not a joint pretrial order.  Maybe

21   separate pretrial orders.

22         MR. PILEVSKY:  Thank you, Your Honor.

23         THE COURT:  How about that?

24         MR. PILEVSKY:  That would work.

25         MR. DAHIYA:  The last thing, Your Honor, I'm a little

1   concerned about, because each nickel that belongs to the Debtor

2   and the family it's very important.  I mean, the legal fees can

3   be humungous from their perspective, like three, $400 --

4           THE COURT:  No.  I appreciate -- I understand that.

5   It sounds like this is a case where you should be think -- you

6   should be working hard to come up with a settlement.

7           MR. DAHIYA:  No, no.  I am thinking about.  But the

8   fact the -- for example, the disqualification itself will

9   entail expenses, then the admin fees.  I mean --

10          THE COURT:  True, true.

11          MR. DAHIYA:  I mean, the -- these things I -- you

12  don't -- I don't understand this.

13          MR. PILEVSKY:  Your Honor --

14          MR. DAHIYA:  That's my -- I have done a very thorough

15  research on this issue of conflict here in a situation like

16  this.  It doesn't arise.  But if he feels, I mean, he has to

17  bring a motion --

18          THE COURT:  So you want me to rule that there is no

19  conflict even though he's made no motion?

20          MR. DAHIYA:  No.  It's just --

21          THE COURT:  What is it -- what's your point?

22          MR. DAHIYA:  Point is that he should move with bona

23  fide, for example, the kind of -- for example, the motion he

24  has filed to extend time (indiscernible) to extend the time to

25  object to the (indiscernible).  It was trustee's job.  He

1    didn't have to do it.  I told him, don't file motion.  He can

2    talk to me.  I have no objection.

3            It's so -- this multiplication that goes on, that is

4    what hurts.  I mean, this is a family that works like 10 to

5    $15.  Look at these kids.  That's fine.  I mean, that's the

6    system.

7            THE COURT:  I understand that, Mr. Dahiya.  So why

8    don't you see if you can work out a way to resolve this with --

9            MR. DAHIYA:  That's what --

10            THE COURT:  -- so that you don't -- rather than

11    converting -- having a contested hearing and then converting

12    the case?

13            MR. DAHIYA:  That's what I'm going to do.  I'm trying

14    to see if I can --

15            THE COURT:  Okay.

16            MR. DAHIYA:  -- refinance the property; see what I

17    can do as quickly.  I had asked my colleague to please give me

18    the admin fees, because I know the proof of claim.  I do know

19    his fees so that I could talk to him.

20            I spoke to a broker on the mortgage.  I spoke to him.

21    He asked me, how much do you want?  I said, I don't know.  I'm

22    speaking to one office, that he has to tell me what his fees

23    are.

24            THE COURT:  Is there any problem with providing him

25    with an estimate of administrative costs?

1          MR. PILEVSKY:  I could get him --

2          MR. DAHIYA:  Today?

3          MR. PILEVSKY:  I could get him administrative fees to

4    date.  The reason why I hadn't in the past is because within

5    that same email asking my fees counsel also mentioned that

6    there's no more than $5,000 worth of claims.  And even though

7    there were $30,000 of proofs of claims my response was, let's

8    talk when you're serious about settlement.  I mean, the claims

9    are there.  If there's a reason to object tell me what they

10   are, I'll do it.

11         You want to do it to keep the cost fees -- my firm

12   and Mr. Messer are cognizant of legal fees and administrative

13   fees and we always try to keep them down.  That's why Mr.

14   Messer had tried six months prior to the commencement of the

15   adversary proceeding to solve this without the need to commence

16   litigation.

17         After the adversary proceeding was commenced we tried

18   also.  And the motion obviously increased administrative fees.

19   So that's where we are today.

20         MR. DAHIYA:  Mr. Messer wanted reasonable fees.  He

21   told them they wanted 20,000.  And they were in the process of

22   arranging for $20,000 to get it -- to let it go away.  And --

23         MR. PILEVSKY:  I have no knowledge of that.

24         MR. DAHIYA:  Yeah.  That I understand.  This is what

25   really happened here.  But, Your Honor, I mean, let him tell me

1    his fees now, whatever, so that we can get the property

2    financed and walk away from this problem.  So -- and I will

3    take the task of fighting with the claimants.  Because I've

4    seen other trustees usually don't file -- the claimants who

5    filed these proof of claims.  They're usually expanded inflated

6    ones.

7                THE COURT:  Okay.  Anything else?

8                MR. PILEVSKY:  No, Your Honor.

9                THE COURT:  Okay, thank you.

10               MR. DAHIYA:  Thank you.

11               MR. PILEVSKY:  Thank you.

12               COURT DEPUTY:  All rise.

13         (Proceedings Concluded)

14

15

16         I certify that the foregoing is a correct transcript from

17    the record of proceedings in the above-entitled matter.

18

19

20   Dated: April 30, 2013              _____

                                        AVTranz

21                                      845 N 3rd Ave

                                        Phoenix, AZ 85003

22

23

24

25

